# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Case No.: 23-CR-237-3 (CJN)** |
| | : | |
| **v.** | : | **18 U.S.C. 231(a)(3)** |
| | : | |
| **KYLE KUMER,** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

## STATEMENT OF OFFENSE

Pursuant to Fed. R. Crim. P. 11, the United States of America, by and through its attorney, the United States Attorney for the District of Columbia, and the defendant, Kyle Kumer, with the concurrence of the defendant's attorney, agree and stipulate to the below factual basis for the defendant's guilty plea—that is, if this case were to proceed to trial, the parties stipulate that the United States could prove the below facts beyond a reasonable doubt:

### *The Attack at the U.S. Capitol on January 6, 2021*

1. The U.S. Capitol, which is located at First Street, SE, in Washington, D.C., is secured twenty-four hours a day by U.S. Capitol Police (USCP). Restrictions around the Capitol include permanent and temporary security barriers and posts manned by USCP. Only authorized people with appropriate identification are allowed access inside the Capitol.

2. On January 6, 2021, the exterior plaza of the Capitol was closed to members of the public.

3. On January 6, 2021, a joint session of the United States Congress convened at the Capitol. During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which had taken place on Tuesday,

November 3, 2020. The joint session began at approximately 1:00 PM. Shortly thereafter, by approximately 1:30 PM, the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

4.      As the proceedings continued in both the House and the Senate, and with Vice President Pence present and presiding over the Senate, a large crowd gathered outside the Capitol. Temporary and permanent barricades, as noted above, were in place around the exterior of the Capitol, and USCP officers were present and attempting to keep the crowd away from the Capitol and the proceedings underway inside. By shortly after 1:00 PM, the situation at the Capitol had become a civil disorder as that term is used in Title 18, United States Code, Section 231, and throughout the rest of the afternoon the civil disorder obstructed the Secret Service's ability to perform the federally protected function of protecting Vice President Pence.

5.      At approximately 2:00 PM, certain individuals in the crowd forced their way through, up, and over the barricades. Officers of the USCP were forced to retreat and the crowd advanced to the exterior façade of the building. Officers with the D.C. Metropolitan Police Department were called to assist officers of the USCP who were then engaged in the performance of their official duties. The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks as required by USCP officers or other authorized security officials.

6.      At such time, the certification proceedings were still underway, and the exterior doors and windows of the Capitol were locked or otherwise secured. Members of the USCP attempted to maintain order and keep the crowd from entering the Capitol; however, shortly after 2:00 PM, individuals in the crowd forced entry into the Capitol, including by breaking windows

and by assaulting members of law enforcement, as others in the crowd encouraged and assisted those acts. The riot resulted in substantial damage to the Capitol, requiring the expenditure of more than $2.9 million dollars for repairs.

7.      Shortly thereafter, at approximately 2:20 PM, members of the House of Representatives and of the Senate, including the President of the Senate, Vice President Pence, were instructed to—and did—evacuate the chambers. Accordingly, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 PM on January 6, 2021. In light of the dangerous circumstances caused by the unlawful entry to the Capitol—including the danger posed by individuals who had entered the Capitol without any security screening or weapons check—Congressional proceedings could not resume until after every unauthorized occupant had been removed from or left the Capitol, and USCP confirmed that the building was secured. The proceedings resumed at approximately 8:00 PM after the building had been secured. Vice President Pence remained in the Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

### *The Defendant's Participation in the January 6, 2021, Capitol Riot*

8.      On January 6, 2021, beginning at approximately 2:42 p.m., numerous members of the mob attacked members of the USCP and MPD who were lawfully engaged in the performance of their official duties defending an entrance to the U.S. Capitol on the Lower West Terrace known as "the tunnel." Over the course of more than two hours, members of the mob threw items at police, struck police with items, sprayed police with chemical irritants, pushed against the police, and stole items from the police defending the tunnel.

9.      By at least approximately 2:30 p.m., defendant Kyle Kumer and Kumer's mother were located on the West Plaza of the U.S. Capitol building. Kumer was wearing a black puffy

coat, backwards baseball cap and beige pants. At that time, the police barricades around the West Plaza had been removed and there were dozens of uniformed police officers on the West Plaza attempting to contain the crowd.

10.     Over the next approximately 20 minutes, Kumer and his mother made their way up to the Lower West Terrace of the U.S. Capitol and onto the Inaugural Stage. While there, Kumer joined in chants with the crowd. Specifically, Kumer chanted "WHOSE HOUSE?! OUR HOUSE" while pumping his fist in the air.

11.     At approximately 2:56 p.m., Kumer and his mother made their way through the dense crowd on the Lower West Terrace and approached the entryway to the tunnel. As Kumer entered the tunnel, he held his phone up over the crowd and appeared to take a photograph of the area, which included the police line. Kumer and his mother then moved further into the tunnel, closer to the police.

12.     At approximately 3:08 p.m., the crowd in the tunnel began to push in unison against each other and the police line. Kumer turned his body so that his back was pushing up against the rioters between him and the police and began to push against them. As he pushed, Kumer called out, "Let's go! C'mon! Let's go!" to the rioters around them to encourage them to join the push against the police.

13.     At approximately 3:10 p.m., many of the rioters in the tunnel left the tunnel, but Kumer and his mother remained.

14.     At approximately 3:11 p.m., another group push began in the tunnel against the police. Kumer joined this push again, by pushing up against rioters in front of him who pushed up against the police line. This group push effort caused MPD Officer D.H. to be crushed between the crowd and the door.

15.     At approximately 3:14 p.m., Kumer was still inside the tunnel. He raised his phone up again his head and appeared to take a photograph of the police line.

16.     At approximately 3:15 p.m., numerous rioters left the tunnel leaving ample open space for Kumer and his mother to also leave, but they remained in the tunnel.

17.     At approximately 3:16 p.m., another group push effort was made against the police line by the rioters inside the tunnel. Kumer joined this push.

18.     At approximately 3:18 p.m., the police inside the tunnel succeeded in pushing all of the rioters back to the entrance of the tunnel. Kumer and his mother were two of the last rioters to be cleared from inside the tunnel.

19.     While in the area immediately outside the entrance to the tunnel, Kumer observed MPD Officer M.F. being dragged into the crowd. He was also nearby when Officer M.F. was rescued and returned to the tunnel by his fellow officers. Kumer also observed another rioter rip a stolen U.S. Capitol police shield out of the hands of a nearby police officer as he stood near the entrance of the tunnel.

20.     The riot at the Capitol was a civil disorder, and it interfered with the Capitol Police's protection of the Capitol and U.S. Secret Service's protection of the vice president, both of which are federally protected functions.  It also obstructed, delayed, or adversely affected commerce in the District of Columbia on January 6.

### *Elements of the Offense*

21.     The parties agree that obstructing law enforcement officers during a civil disorder, in violation of 18 U.S.C. §231(a)(3), requires the following elements:

a.  The defendant knowingly committed or attempted to commit an act with the intended purpose of obstructing, impeding, or interfering with one or more law enforcement officers.

b.  At the time of the defendant's act, the law enforcement officer or officers were engaged in the lawful performance of their official duties incident to and during a civil disorder.

c.  The civil disorder in any way or degree obstructed, delayed, or adversely affected commerce or the movement of any article or commodity in commerce, or the conduct or performance of any federally protected function.

### *Defendant's Acknowledgments*

22.    The defendant knowingly and voluntarily admits to all the elements as set forth above.  Specifically, the defendant admits that:

a.   He committed or attempted to commit an act to obstruct, impede, or interfere with USCP and MPD officers who were lawfully engaged in the performance of their official duties incident to and during the commission of a civil disorder.

b.  The civil disorder obstructed, delayed, or adversely affected commerce or the movement of any article or commodity in commerce or the conduct or performance of any federally protected function.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    */s/ Kaitlin Klamann*
KAITLIN KLAMANN
SEAN MCCAULEY
Assistant United States Attorneys

## DEFENDANT'S ACKNOWLEDGMENT

I, Kyle Kumer, have read this Statement of the Offense and have discussed it with my attorney. I fully understand this Statement of the Offense. I agree and acknowledge by my signature that this Statement of the Offense is true and accurate. I do this voluntarily and of my own free will. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Statement of the Offense fully.

Date: 12/11/23

Kyle Kumer
Defendant

## ATTORNEY'S ACKNOWLEDGMENT

I have read this Statement of the Offense and have reviewed it with my client fully. I concur in my client's desire to adopt this Statement of the Offense as true and accurate.

Date: 12/11/23

J.R. Hobbs
Attorney for Defendant